# IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
## AT KNOXVILLE
Assigned on Briefs November 15, 2011

## STATE OF TENNESSEE v. MARCUS L. BRANNER

**Appeal from the Criminal Court for Knox County**
**No. 67840      Richard R. Baumgartner, Judge**

---

**No. E2011-00404-CCA-R3-CD-FILED-JANUARY 17, 2012**

---

The defendant, Marcus L. Branner, appeals his Knox County Criminal Court jury convictions of second degree murder, *see* T.C.A. § 39-13-210 (1997), and two counts of attempted second degree murder, *see id.* §§ 39-13-210; 39-12-101, for which he received an effective sentence of 24 years' incarceration. He contends that the evidence is insufficient to support his convictions and that the trial court committed error at sentencing by imposing enhancement factors not found beyond a reasonable doubt by a jury to increase his sentence beyond the statutory minimum. We determine that the evidence is sufficient to support his convictions and that the trial court committed no reversible error at sentencing. Accordingly, we affirm the judgments of the trial court.

### Tenn. R. App. P. 3; Judgments of the Criminal Court Affirmed

JAMES CURWOOD WITT, JR., J., delivered the opinion of the Court, in which D. KELLY THOMAS, JR., and CAMILLE R. MCMULLEN, JJ., joined.

Bruce Poston (at trial); and J. Liddell Kirk (on appeal), Knoxville, Tennessee, for the appellant, Marcus L. Branner.

Robert E. Cooper, Jr., Attorney General and Reporter; Renee W. Turner, Assistant Attorney General; Randall E. Nichols, District Attorney General; and Scott Green, Assistant District Attorney General, for the appellee, State of Tennessee.

### OPINION

Mary Helen Smith testified that on September 7, 1998, she and several friends attended the Boomsday Festival in Knoxville. Sometime near midnight, Ms. Smith went to the Underground, a Knoxville Old City nightclub, with her friends, Amy Wilson, John Bales, Mike Gardner, and Rick Cagle. The group consumed alcohol throughout the night and left

the Underground at closing time, which was approximately 3:00 in the morning.

As Ms. Smith exited the club with Messers Bales, Gardner, Cagle, and another friend, Charles McGinnis, they noticed Ms. Wilson outside "speaking very animatedly" with four African-American men. Ms. Smith recalled at trial that Ms. Wilson seemed to be arguing with the men. Because Ms. Wilson was alone, the friends walked toward her. The argument then became "heated pretty quickly." Ms. Smith pulled Ms. Wilson away as a fight erupted between the four men and Messers Bales, Gardner, Cagle, and McGinnis. As the "scuffle" ended, the four men fled the area on foot.

After ensuring that Ms. Wilson had a ride home, Ms. Smith and her friends left the Underground parking lot in Ms. Smith's Nissan Pathfinder. Mr. Bales drove the vehicle, and Ms. Smith sat in the front passenger seat. Mr. Cagle sat behind Mr. Bales, Mr. McGinnis sat behind Ms. Smith, and Mr. Gardner sat between the two men in the back seat of the Pathfinder. As the group drove toward the intersection of Central Avenue and Jackson Avenue, Mr. McGinnis saw the four men walking back down the street toward the Underground. Ms. Smith said the four men hollered and "gesticulat[ed]" at them as the men approached the Pathfinder.

Ms. Smith recalled that the back doors to her vehicle must have opened because the dome lights came on. As soon as the lights came on, one of the men began shooting at the vehicle from approximately 15 feet away. Mr. Cagle was shot and fell momentarily in the street before climbing back into the vehicle. Mr. McGinnis was shot and fell back into the vehicle. The group soon realized that Mr. Gardner, who never left his seat, had been shot. They were unable to determine whether Mr. Gardner was breathing, so they drove straight to Baptist Hospital, which was then located on the south side of the Henley Street bridge. Ms. Smith was unable to identify the shooter that night or at trial.

Charles McGinnis testified that he walked to the Underground after watching the Boomsday fireworks display. At the Underground, he met his friends: Messers Cagle, Gardner, Bales, and Ms. Smith. As he was leaving the club that night, Ms. Wilson came into the club crying with apparent marks on her neck from some sort of altercation. She wanted to go to the Knoxville Police Department (KPD) to report that she had been attacked. Mr. McGinnis walked outside to find the defendant and his companions fighting Mr. McGinnis' friends. The entire altercation lasted approximately six minutes. As the defendant and his friends fled down Central Avenue, they yelled back at Mr. McGinnis and his friends, "'We'll be back to kill all y'all mother f*****s.'"

Mr. McGinnis and his friends got into the Pathfinder, laughing about the threat, and began to leave the Old City. As they approached Central Avenue, the four men returned.

Mr. Bales pulled the vehicle up to the men. Mr. McGinnis recalled that the defendant was trying to coax them out of the vehicle. The defendant kept one hand behind his back. Mr. McGinnis opened his door to tell the defendant that they were going home and that they did not want any trouble. No one in the vehicle had a gun. As he opened the door, Mr. McGinnis "saw [the defendant] come from behind his back, point the gun at [the men] in the backseat, [and] start firing."

Mr. McGinnis soon realized that he had been grazed by several bullets. He heard Mr. Cagle announce that he had also been shot. Mr. Gardner, however, "just slumped over" and did not say anything. The group "took off" toward Baptist Hospital. Mr. McGinnis had consumed only two beers throughout the night. He admitted at trial that his other friends were intoxicated, except for Mr. Bales who did not drink at all.

Rick Cagle testified that he was Mr. Gardner's best friend. He and Mr. Gardner drank beer, watched baseball, and enjoyed the Boomsday fireworks display near their apartments on September 7 before joining several friends first at the Lord Lindsey club and eventually at the Underground, where the group continued to consume alcohol. He knew of no problems with other club patrons until leaving, when he learned that some men had been choking a girl in the parking lot. He saw Messers Gardner, Bales, and McGinnis outside "jawing back and forth" with the men, and then a fight broke out. Mr. Cagle went to assist his friends, and the men soon ran away. As the men fled, one said, "'I'm going to go get my gun, and somebody's going to die.'" One of the men "ran up on" the hood of another person's truck as he fled.

Mr. Cagle, who was intoxicated, asked his friends for a ride home. As the five began to leave the Old City in Ms. Smith's Pathfinder, they saw the men returning on foot. Someone in the Pathfinder yelled, "'Stop!'" Mr. Cagle did not want to be in the vehicle if the men "rushed" it, so he opened the rear driver's-side door to flee. Suddenly, "[s]hots rang out [and he] ended up outside the [Pathfinder]." Mr. Cagle climbed back into the vehicle and discovered that both Mr. McGinnis and Mr. Gardner had been shot. Mr. Gardner, however, was unconscious, so they rushed to the hospital.

Mr. Cagle was unable to identify any of the shooters. He suffered wounds to his right hand, arm, and lower back. He said the bullets produced "very small hole[s]" and "undoubtedly [came from] a .22."

Kurt Rasmussen, an Underground employee, testified that he frisked individuals entering the club on the night of the shooting. After closing, he heard about a fight in the parking lot but went outside to learn the altercation had ended. Mr. Rasmussen saw that Ms. Wilson had been attacked in some way and learned from others that the men

had "pulled the guy off of [her]." Several of the individuals involved in the fight joked about one of the fleeing men threatening to "get a gun and come back and shoot [them]." Mr. Rasmussen returned to his work inside the club and, within 15 minutes, heard shots outside. A club manager telephoned the police immediately. Mr. Rasmussen recalled hearing several "small pops" followed by "louder pops that were closer" to the club. In a statement to the police later that morning, Mr. Rasmussen recalled that two of the African-American men came into the club earlier that night while their two companions remained outside.

Sara Blair, a friend of Ms. Wilson and the victims, testified that she recalled seeing a "small shouting match, kind of scuffle, out in the street" after the club closed as she was helping her boyfriend load disc jockey equipment into his car. She saw Messers Bales, Cagle, Gardner, and Ms. Smith outside joking about "that guy . . . coming back to get [them]." Ms. Blair saw Ms. Smith's Pathfinder leave the parking lot and, 20 to 30 seconds later, she "heard popping noises." She then saw another friend still in the parking lot "come out of his car and aim[] his gun towards the center of the Old City" in the direction of the shooting.[1] Ms. Blair fled back to the club "crying" and waited for the police to arrive.

Roger Wayne Hobbs, a Knoxville Utilities Board (KUB) employee, testified that he was working on a repair job during the night of September 7-8, 1998. The repair job required Mr. Hobbs to drive a dump truck to the Jackson Avenue lot, near the Underground, where KUB maintained a gravel supply. As he left the lot, Mr. Hobbs saw four African-American men in the street yelling at some people in an approaching vehicle. He did not see anyone get out of the vehicle. One man walked toward the vehicle while the other three stood behind him on the sidewalk. Then, "[a]t the bat of an eye, [the man] reached back in here in his back pocket with his right hand, went like in a police stance, hit that gun like that, went pow, pow, pow," and began shooting at the people in the vehicle. Mr. Hobbs also saw "muzzle flashes" coming from up the street near the Underground, and the men began to run. Mr. Hobbs knew neither the defendants nor the victims in the shooting.

Doctor Sandra Elkins, the Knox County Medical Examiner at the time of the offenses and at trial, performed the autopsy of Mr. Gardner and determined that Mr. Gardner suffered a fatal gunshot wound to the right side of his chest. The bullet perforated Mr. Gardner's right lung, lacerated his heart, esophagus, and aorta, and perforated his left lung before coming to rest in the muscle tissue of his left side. The wound caused severe internal bleeding and multiple internal injuries culminating in Mr. Gardner's death. Doctor Elkins recovered the bullet from the victim's side and delivered it to KPD Detective Mark Waggoner for forensic analysis. Toxicology screening revealed Mr. Gardner's blood alcohol

---

[1] Although testimony and physical evidence revealed the presence of another shooter, no one identified who may have fired the shots from the vicinity of the parking lot.

level was .24 percent at the time of his death. Medical records of Messers McGinnis and Cagle confirming that they both suffered gunshot wounds on the night of the shooting were admitted at trial via stipulation of the parties.

KPD Detective Gerald Smith searched the crime scene for evidence related to the shooting. He recovered a pager and a AA battery in the street near the club and eight 9 millimeter casings in a small parking lot between the JFG coffee factory building and the Underground. He also discovered a .22 caliber casing and bullet holes in two windows and in an interior door of a building across the street from the shooting scene. Thus, the investigation showed that two weapons, a 9 millmeter and a .22 caliber, were used during the shooting. Inside Ms. Smith's Pathfinder, Detective Smith found two bullet holes in the rear passenger-side door and a shattered window that, judging by the glass found inside the vehicle, had been shot into from the street. Detective Smith documented an "extensive amount of blood" in the center of the back seat of the vehicle. Upon learning that the shooting weapon was recovered at a nearby apartment, Detective Smith documented the time it would take to run from the scene to the apartment as six to seven minutes.

KPD Detective James Quick went to Townview Terrace Apartments in search of the suspects. Via consent to search, Detective Quick searched one apartment and discovered a bag of clothing belonging to the defendant that contained his identification. Detective Quick also recovered a pistol wrapped in a plastic bag under the kitchen sink of the apartment. KPD Detective Joe Cox forwarded the .22 caliber pistol to the Tennessee Bureau of Investigation (TBI) for further analysis.

TBI Special Agent Robert Daniel Royce performed firearms identification testing on the pistol and the .22 caliber bullet recovered from Mr. Gardner's body. He determined that the pistol, a fully functional .22 caliber High Standard Sentinel snub model, had been fired nine times since last cleaned. He also determined that the bullet removed from the victim had been fired from the weapon confiscated at the apartment.

With this proof, the State rested its case in chief. Following the denial of a motion for judgments of acquittal, the defendant presented the testimony of Gib Frye, a "bouncer" at the Underground on the night of the shooting.

Mr. Frye testified that everyone was "[c]ordial and friendly" throughout the night. Sometime after closing as he swept the outside sidewalk, Mr. Frye witnessed an altercation involving the defendant and his friends when a "long-haired man" came outside

and said "something derogatory" to the defendant and his friends.[2]  Mr. Frye recalled Mr. Bales's starting the fight and that Messers Cagle, McGinnis, and Gardner joined in.  One African-American man was "tied up with . . . [Ms.] Wilson," choking her as she clutched his shirt.  Mr. Frye broke them apart, and the man fled down the street.  As the man ran down the street, Mr. Frye saw a truck "pull[] out to strike" the man, causing the man to fall to the ground where Mr. Gardner again "jumped" him.  Mr. Fyre then pulled Mr. Gardner from the man.  Once the men fled on foot, Mr. Frye went inside the club to finish closing.  He soon heard several gunshots.  That morning, as everyone gave their statements to the police, Mr. Frye admitted that there was "a lot of talk . . . rumors . . . [and] different stories" told about the shooting.

On the night of the shooting, 16-year-old Torrey Allen was with the defendant, Rico Jones, and John Noel.  He testified that Messers Jones and Noel shared an apartment at the nearby Townview Terrace apartment complex, so the group decided to walk to the Underground.  Because they were underage, Messers Jones and Allen stayed outside while the defendant and Mr. Noel went inside the club.  There were no conflicts throughout the night until a man with "[b]rown long curly hair . . . bumped into" Mr. Noel as everyone was leaving the club.  Many people were drunk, and an argument quickly escalated into a fight when someone punched Mr. Jones.  Mr. Allen recalled Mr. McGinnis' pulling a gun and saying "he was about to start shooting," so the fight soon dispersed.  As Mr. Jones left the scene, he said he was going to the apartment to get his gun.

When the defendant, Mr. Noel, and Mr. Allen caught up to Mr. Jones, he was already on his way back to the Old City with the weapon.  Mr. Jones insisted upon returning to retrieve his pager, which he had dropped during the fight.  Mr. Allen said that it was clear that Mr. Jones was "going to go with or without [them]," so the group decided not to let him return alone.  The defendant, however, asked Mr. Jones for the gun because "he didn't want [Mr. Jones] to do nothing stupid."

As the group returned to the Old City, Ms. Smith's vehicle stopped.  Mr. McGinnis got out of the vehicle and pulled a gun, so the defendant started shooting.  The shooting occurred "[r]eal quick[ly]," and the group fled when they heard louder shots coming from the direction of the Underground.

Mr. Allen saw a bullet hit Mr. McGinnis, but he did not know someone had died from the shooting until it was reported on the six o'clock news later that morning.  Mr. Allen did not go voluntarily to the police because he did not think the police would believe

---

[2] None of the witnesses identified the "long-haired man," and it appears from the record that he was not associated with any of the victims.

that the victims had escalated the incident by pulling a gun. In his statement to the police, Mr. Allen ultimately identified the defendant as the shooter after he initially lied to the police about the defendant's involvement. Neither Mr. Allen nor Mr. Jones were charged in the shooting, and the defendant fled to Chicago for two months before surrendering to police.

The defendant testified consistently with Mr. Allen's testimony concerning Mr. McGinnis' pulling a weapon and threatening to harm the defendant and his friends. He claimed that he panicked and shot the victims out of fear. He admitted that he pulled the trigger until the pistol was empty. He said that after the shooting he was "scared to death" and did not think the police would believe him if he reported the shooting or surrendered. He expressed remorse for the victim's death and said "it wasn't meant to happen."

With this evidence, the jury returned verdicts of second degree murder in count one and attempted second degree murder in counts two and three. At a separate sentencing hearing, the trial court imposed a sentence of 24 years' incarceration to be served at 100 percent for the second degree murder conviction and sentences of 11 years' incarceration for each attempted second degree murder conviction, to be served concurrently. Trial counsel did not file a motion for new trial in the case. At a November 1, 2001 status hearing, trial counsel indicated that the defendant's only appellate challenge was the sufficiency of the evidence. Despite the trial court's reminder to counsel to file a notice of appeal, trial counsel neglected to do so. Following various pro se pleadings and the appointment of counsel, this case is properly before the court via the trial court's April 13, 2006 grant of a delayed appeal.

On appeal, the defendant challenges the sufficiency of the evidence to support his convictions and the trial court's imposition of a sentence beyond the statutory minimum. The State argues that the evidence is sufficient to support the convictions and that the trial court's erroneous application of two enhancement factors in contravention of *State v. Gomez*, 239 S.W.3d 733 (Tenn. 2007), was harmless based upon the defendant's criminal history and admissions at trial concerning the use of a firearm. We will address each claim in turn.

*Sufficiency of the Evidence*

We review the defendant's claim of insufficient evidence mindful that our standard of review is whether, after considering the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. Tenn. R. App. P. 13(e); *Jackson v. Virginia*, 443 U.S. 307, 324 (1979); *State v. Winters*, 137 S.W.3d 641, 654 (Tenn. Crim. App. 2003). This standard applies to findings of guilt based upon direct evidence, circumstantial evidence, or a combination of direct and circumstantial evidence. *State v. Dorantes*, 331 S.W.3d 370, 379 (Tenn. 2011).

When examining the sufficiency of the evidence, this court should neither re-weigh the evidence nor substitute its inferences for those drawn by the trier of fact. *Id.*. Questions concerning the credibility of the witnesses, the weight and value of the evidence, as well as all factual issues raised by the evidence are resolved by the trier of fact. *State v. Cabbage*, 571 S.W.2d 832, 835 (Tenn. 1978). Significantly, this court must afford the State the strongest legitimate view of the evidence contained in the record as well as all reasonable and legitimate inferences which may be drawn from the evidence. *Id*.

Second degree murder is the "knowing killing of another." T.C.A. § 39-13-210(a)(1) (1997). One attempts to commit second degree murder when he or she, acting with the culpability required in Code section 39-13-210(a)(1), believes the conduct will kill the other person without further conduct on the actor's part. *Id*. § 39-12-101(a)(2). A person acts knowingly with respect to a result of the person's conduct when the person is aware that the conduct is reasonably certain to cause the result. *Id*. § 39-11-302(b).

The defendant argues that the evidence showed that he acted in self-defense. In the light most favorable to the State, the proof established that the defendant and his friends engaged in a fight with the victims. As the defendant and his friends fled the scene, one threatened to return to the scene with a gun and voiced an intention to kill someone. The defendant and his friends indeed returned to the scene within minutes armed with a .22 caliber pistol. When the defendant and his friends made additional threatening remarks to the victims, Mr. Bales stopped the vehicle. As Mr. McGinnis opened the door to the vehicle, the defendant opened fire on the victims and did not stop shooting until the pistol was emptied. Mr. Gardner suffered a fatal gunshot wound to the chest, while Messers McGinnis and Cagle suffered multiple wounds as well. The victims all testified that they were unarmed. The jury chose to reject the defendant's claim of self-defense, as was within their province to do. We determine that the evidence sufficiently established the defendant's convictions of second degree murder and two counts of attempted second degree murder.

*Sentencing*

Next, the defendant challenges the trial court's imposition of sentences beyond the statutory minimum in the absence of jury findings concerning the enhancement factors. The State concedes that the trial court erroneously applied two enhancement factors, but the State argues that the application of enhancement factors concerning the defendant's prior criminal history and use of a firearm were properly considered and adequately support the trial court's sentencing determination. Following our review, we agree with the State.

The trial court sentenced the defendant for his 1998 offenses in 2001, prior to the 2005 amendments to our sentencing code. When a defendant so sentenced challenges

the length of his sentence, this court generally conducts a de novo review of the record with a presumption that the determinations made by the trial court are correct. T.C.A. § 40-35-401(d) (1997). This presumption, however, is conditioned upon the affirmative showing in the record that the trial court considered the sentencing principles and all relevant facts and circumstances. *State v. Ashby*, 823 S.W.2d 166, 169 (Tenn. 1991). The burden of showing that the sentence is improper is upon the appellant. *Id.* If the review reflects the trial court properly considered all relevant factors and its findings of fact are adequately supported by the record, this court must affirm the sentence, "even if we would have preferred a different result." *State v. Fletcher*, 805 S.W.2d 785, 789 (Tenn. Crim. App. 1991). In the event the record fails to demonstrate the required consideration by the trial court, appellate review of the sentence is purely de novo. *Ashby*, 823 S.W.2d at 169.

In making its sentencing determination in the present case, the trial court, at the conclusion of the sentencing hearing, was obliged to determine the propriety of sentencing alternatives by considering (1) the evidence, if any, received at the trial and sentencing hearings, (2) the presentence report, (3) the principles of sentencing and arguments as to sentencing alternatives, (4) the nature and characteristics of the criminal conduct involved, (5) evidence and information offered by the parties on the enhancement and mitigating factors, (6) any statements the defendant made in his behalf about sentencing, and (7) the potential for rehabilitation or treatment. T.C.A. §§ 40-35-210(a), (b); -103(5); *State v. Holland*, 860 S.W.2d 53, 60 (Tenn. Crim. App. 1993).

Subsequent to the defendant's sentencing in this case, on June 24, 2004, in *Blakely v. Washington*, 542 U.S. 296 (2004), the United States Supreme Court signaled that some judge-sentencing regimes conflicted with criminal defendants' rights to have juries participate in certain sentencing determinations. *Blakely* held that "'[o]ther than the fact of a prior conviction, any fact that increases the penalty for a crime beyond the prescribed statutory maximum must be submitted to a jury, and proved beyond a reasonable doubt.'" *Id.* at 301 (quoting *Apprendi v. New Jersey*, 530 U.S. 466 (2000)). The "statutory maximum" to which a trial court may sentence a defendant is not the maximum sentence after application of appropriate enhancement factors, other than the fact of a prior conviction, but the "maximum sentence a judge may impose solely on the basis of the facts reflected in the jury verdict or admitted by the defendant." *Id.* at 303. Under *Blakely*, the "statutory maximum" sentence that may be imposed is the presumptive sentence applicable to his or her offense. *See id.* The presumptive sentence may be exceeded without the participation of a jury only when the defendant has a prior conviction and/or when an otherwise applicable enhancement factor was reflected in the jury's verdict or was admitted by the defendant.

On January 22, 2007, the United States Supreme Court released its decision in *Cunningham v. California*, 549 U.S. 270 (2007), holding that California's sentencing scheme

did not survive Sixth Amendment scrutiny under *Blakely*. Prior to *Cunningham*, the Tennessee Supreme Court had held that a judge-enhanced sentence pursuant to Tennessee's pre-2005 sentencing regime did not amount to plain error and warranted no relief, *see State v. Gomez*, 163 S.W.3d 632 (Tenn. 2005) (*Gomez I*)*;* however, on the heels of *Cunningham,* on February 20, 2007, the United States Supreme Court vacated *Gomez I* and remanded that case for reconsideration in light of *Cunningham*, *see Gomez v. Tennessee*, 549 U.S. 1190 (2007). In *State v. Gomez*, 239 S.W.3d 733 (Tenn. 2007) (*Gomez II*)*,* the supreme court held that provisions of the pre-2005 Tennessee sentencing law violated Gomez' right to trial by jury and overruled the position the court had taken in *Gomez I* that the application of the pre-2005 law did not equate to plain error. It is with this decisional backdrop in mind that we examine the trial court's sentencing determinations in this case.

As a Range I offender, the presumptive sentence for the defendant's second degree murder conviction was 20 years. *See* T.C.A. §§ 40-35-112(a)(1); -210(c). The presumptive sentence for the attempted second degree murder convictions was eight years. *See id.* In arriving at sentences beyond the presumptive sentences, the trial court applied four enhancement factors concerning the defendant's "previous history of criminal convictions," *see id.* § 40-35-114(1); "[t]he offense[s'] involv[ing] more than one victim," *see id.* § 40-35-114(3); the defendant's "previous history of unwillingness to comply with conditions of a sentence involving release in the community," *see id.* § 40-35-114(8); and the defendant's "employ[ing] a firearm . . . during the commission of the offense," *see id.* § 40-35-114(9). The trial court noted in its sentencing findings that it placed "most emphasis" upon the defendant's use of a firearm in determining the length of the sentences.

The State correctly concedes that the trial court erroneously applied factors (3) and (8). The State contends, however, that the trial court properly considered the defendant's criminal history and use of a firearm, the latter being admitted by the defendant at trial. Indeed, a sentencing court may enhance a defendant's sentence based upon his criminal history and those facts admitted by the defendant. *See Blakely*, 542 U.S. at 303. Accordingly, we agree that the trial court correctly applied factors (1) and (9). In light of the trial court's emphasis on factor (9), we also agree that the erroneous application of factors (3) and (8) was harmless and affirm the trial court's imposition of sentences.

*Conclusion*

The evidence sufficiently established the defendant's convictions of second degree murder and two counts of attempted second degree murder. The record also supports the trial court's imposition of sentences. Accordingly, we affirm the judgments of the trial court.

_____
JAMES CURWOOD WITT, JR., JUDGE